IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MONTES-SANTIAGO, et al

    Plaintiffs

    v.                                                    CIVIL NO. 07-1717 (SEC)

STATE INSURANCE FUND CORP, et al.

    Defendants

**OPINION AND ORDER**

    Pending before the Court is Plaintiffs' motion for partial summary judgment (Docket # 161), and Defendants State Insurance Fund ("SIF") and Dr. Paul Tomljanovich's ("Dr. Tomljanovich") (collecively "Defendants") opposition thereto (Dockets ## 184 & 187). Third-party Defendant Instituto de Manos, CSP ("IDM") filed a motion joining Defendants' oppositions (Docket # 190). Thereafter, Plaintiffs replied. Dockets ## 198-200. After examining the filings, and the applicable law, Plaintiffs' motion is **DENIED.**

**Factual Background**

    On August 10, 2007, Plaintiffs Juan Montes Santiago ("Montes"), Juan Montes, Sonia Santiago[1] and their conjugal partnership (collectively "Plaintiffs") filed the instant case against SIF, Dr. Tomljanovich and other defendants, under diversity jurisdiction, alleging that Montes suffered a total loss of function in his left hand and arm due to Defendants' negligent acts and omissions. Plaintiffs further allege that Montes is totally and permanently disabled as a result of said injuries, and, thus cannot continue to work in his profession as a welder. As such, Plaintiffs request $6,000,000 in damages, including the costs of present and future medical and

---

[1] Montes' parents and residents of Idaho.

psychological treatment, loss of income, mental pain and emotional suffering for himself as well as for his parents, interest, and attorney's fees.

On March 5, 2009, the SIF's motion to dismiss was denied. Docket # 43.  Thereafter, the parties began discovery.  On April 20, 2009, Plaintiffs filed an amended complaint, to include claims against IDM. Docket # 56. According to the amended complaint, IDM had a contract with SIF to provide medical services in hand surgery at Hospital Industrial, and sub-contracted Dr. Tomljanovich to provide said services.  Plaintiffs once again amended the complaint on April 7, 2010. Docket # 127.

After numerous procedural hurdles, Plaintiffs moved for summary judgment. Docket # 161. SIF and Dr. Paul Tomljanovich opposed (Dockets ## 184 & 187), and IDM filed a motion joining said co-defendants' oppositions. Docket # 190.

**Standard of Review**

The Court may grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ramírez Rodríguez v. Boehringer Ingelheim, 425 F.3d 67, 77 (1st Cir. 2005).   In reaching such a determination, the Court may not weigh the evidence.  Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994).  At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

Once the movant has averred that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least

one fact in issue that is both genuine and material.  Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citations omitted).  "A factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'"  DePoutout v. Raffaelly, 424 F.3d 112, 116 (1st Cir. 2005)(citing Garside, 895 F.2d at 48 (1st Cir. 1990)); see also SEC v. Ficken, 546 F.3d 45, 51 (1st Cir. 2008).

In order to defeat summary judgment, the opposing party may not rest on conclusory allegations, improbable inferences, and unsupported speculation.  See Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir. 2005) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).  Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a genuine issue of material fact.  Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997).  Once the party moving for summary judgment has established an absence of material facts in dispute, and that he or she is entitled to judgment as a matter of law, the "party opposing summary judgment must present definite, competent evidence to rebut the motion."  Méndez-Laboy v. Abbot Lab., 424 F.3d 35, 37 (1st Cir. 2005) (citing Maldonado-Denis v. Castillo Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

"The non-movant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trial-worthy issue. . . .  Failure to do so allows the summary judgment engine to operate at full throttle."  Id.; see also Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); Medina-Muñoz, 896 F.2d at 8 (citing Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must

have substance in the sense that it limns differing versions of the truth which a factfinder must resolve.").

**Applicable Law and Analysis**

*Physician's liability*

Because this is a diversity case, the substantive law of Puerto Rico controls. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); see also Borges v. Serrano-Isern, 605 F.3d 1, 6 (1st Cir. 2010); Santiago v. Hosp. Cayetano Coll y Toste, 260 F. Supp. 2d 373, 380 (1st Cir. 2003). Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141, governs a physician's liability in a medical malpractice suit. See Cortes-Irizarry v. Corporacion Insular De Seguros, 111 F.3d 184, 189 (1st Cir. 1997). Said article provides that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws Ann. tit. 31, § 5141.

Under this statute, "three elements comprise a prima facie case of medical malpractice." Santiago, 260 F. Supp. 2d at 380 (citing Cortes-Irizarry, 111 F.3d at 189). In order to prevail in a medical malpractice claim, a plaintiff must establish three elements: "(1) the basic norms of knowledge and medical care applicable to general practitioners or specialists; (2) proof that the medical personnel failed to follow these basic norms in the treatment of a patient; and (3) a causal relation between the act or the omission of the physician and the injury by the patient." Santiago, 260 F. Supp. 2d at 381: see also Sierra-Perez v. United States, 779 F. Supp. at 643; Medina Santiago v. Dr. Alan Velez, 120 P.R. Dec. 380 (1988); Pagan Rivera v. Municipio de Vega Alta, 127 P.R. Dec. 538 (1990); Marcano Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162, 167 (1st Cir. 2005); Cortes-Irizarry, 111 F.3d at 189.

The First Circuit has held that "[u]nder this framework, breach of duty is an essential element of a cause of action for malpractice ... [and] [t]o consider whether a breach has been

shown, we first must understand the nature of the duty owed." Borges, 605 F.3d at 6. Thus the "burden of a medical malpractice plaintiff in establishing the physician's duty is more complicated than that of an ordinary tort plaintiff. Instead of simply appealing to the jury's view of what is reasonable under the circumstances, a medical malpractice plaintiff must establish the relevant national standard of care." Lama v. Borras, 16 F.3d 473, 478 (1st Cir. 1994).

"The general parameters of the duty of care that a physician owes to a patient under Puerto Rico law are uncontroversial." Borges, 605 F.3d at 7 (citing Cortes-Irizarry, 111 F.3d at 190). Specifically, "[t]he physician must employ a level of care consistent with that set by the medical profession nationally." Id. In explaining the duty of care owed to patients, Puerto Rico courts have described it as that level of care which, recognizing the modern means of communication and education, meets the professional requirements generally acknowledged by the medical profession. Santiago, 260 F. Supp. 2d at 380 (citing Cortes-Irizarry v. Corp. Insular de Seguros, 928 F. Supp. 141, 144 (D.P.R. 1996)); see also Oliveros v. Abreu, 101 P.R. Dec. 209, 226 (1973); Marcano Rivera, 415 F.3d at 167-168. Physicians are "expected to possess, and use, that level of knowledge and skill prevalent in his or her specialty generally, not simply the knowledge and skill commonly displayed in the community or immediate geographic region where the treatment is administered." Santiago, 260 F. Supp. 2d at 381 (citing Rolon-Alvarado v. Municipality of San Juan, 1 F.3d 74, 77 (1st Cir. 1993)). Moreover, "a health care provider has 'a duty to use the same degree of expertise as could reasonably be expected of a typically competent practitioner in the identical specialty under the same or similar circumstances, regardless of regional variations in professional acumen or level of care.'" Cortes-Irizarry, 111 F.3d at 190; Rolon-Alvarado, 1 F.3d at 77-78. Therefore, a surgeon must use the same level of care that is accepted as good practice in his subspecialty nationwide. Borges, 605 F.3d at 7 (citing Cortes-Irizarry, 111 F.3d at 190).

The courts do not hold a doctor to a "standard of perfection nor makes him an insurer of his patient's well-being." Cortes-Irizarry, 928 F. Supp. at 145. An "error of judgment regarding diagnosis or treatment does not lead to liability when expert opinion suggests that the physician's conduct fell within a range of acceptable alternatives." Lama, 16 F.3d at 478. As such, only when a physician "has failed to comply with the basic norms comprised in the national standard of care may he be held liable for medical malpractice." Santiago, 260 F. Supp. 2d at 381 (citing Torres-Nieves v. Hospital Metropolitano, 998 F. Supp. 127, 137 (D.P.R. 1998.)) Under Puerto Rico law, a physician is afforded "a presumption that he has provided an appropriate level of care." Id. Plaintiff must "refute this presumption by adducing evidence sufficient to show both the minimum standard of care required and the physician's failure to achieve it." Id.

Since medical knowledge and training are critical to demonstrate the parameters of a health-care provider's responsibilities, the minimum standard of acceptable care is almost a matter of informed opinion. Santiago, 260 F. Supp. 2d at 381 (citing Rolon-Alvarado, 1 F.3d at 78.) Notwithstanding, insofar as causation cannot be found based on mere speculation and conjecture, expert testimony is also generally essential in order to clarify complex medical issues that are more prevalent in medical malpractice cases than in standard negligence cases. See Marcano Rivera, 415 F.3d at 168. Therefore, when claiming a breach of a physician's duty of care, the plaintiff must adduce expert testimony to show the minimum acceptable standard, and confirm that the defendant doctor failed to provide it. Santiago, 260 F. Supp. 2d at 382 (citing Cortes-Irizarry, 111 F.3d at 190.)

Courts have noted that "[i]n the medical malpractice context, an action for damages lies when, by preponderance of evidence, it is proved that the doctor's negligent conduct was the factor that most probably caused the plaintiff's damage." Santiago, 260 F. Supp. 2d at 381

(citing Sierra-Perez, 779 F. Supp. at 643); see also Perez-Cruz v. Hosp. La Concepcion, 115 P.R. Dec. 721, 732 (1984). Causation "is also more difficult in a medical malpractice case than in a routine tort case because a jury must often grapple with scientific processes that are unfamiliar and involve inherent uncertainty." Lama, 16 F.3d at 478.

*Hospital's liability*

Article 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5142, the statutory source of the vicarious liability doctrine, states in pertinent part that: "[t]he obligation imposed by § 5141 of this title is demandable, not only for personal acts and omissions, but also for those of the persons for whom they should be responsible...Owners or directors of an establishment or enterprise are likewise liable for any damages caused by their employees in the service of the branches in which the latter are employed or on account of their duties." As a result, when a patient goes directly to a hospital for medical treatment, and the hospital provides the physicians that treats him/her, the hospital and the physician are jointly liable for any act of malpractice. Ramirez-Velez v. Centro Cardiovascular, No. 05-1732, slip op. at 11 (D.P.R. Oct. 25, 2007); see also Marquez-Vega v. Martinez-Rosado, 116 P.R. Dec. 397, 406-407 (1985).

A hospital's liability towards its patients is a firmly established doctrine by the highest court of Puerto Rico, since said institutions owe their patients the degree of care that would be exercised by a reasonable and prudent man in the same conditions and circumstances. Ramirez-Velez, slip op. at 10. A hospital has been held liable "to its patients for malpractice 'on account of a negligent act on the part of the institution's employees; consequently, the hospital's liability has been predicated on the vicarious liability doctrine.'" Id. at 11 (internal citations omitted). However, when a physician is not employed by the hospital, but instead is granted the privilege of using the hospital's facilities for his/her private patients, the hospital should not be

held liable for the exclusive negligence of an unsalaried physician, who was first and foremost entrusted with the patient's health. Marquez-Vega, 116 P.R. Dec. at 408-409.

In their motion for partial summary judgment, Plaintiffs argue in essence that Defendants failed to provide adequate and timely surgical and medical care at the time of Montes' injury, thus causing the osteomyelitis that later developed at the injury site. In opposition, Defendants contend that the gist of this case is whether they are responsible for the onset of osteomyelitis. According to Defendants, controversy remains as to material issues of fact which preclude summary judgment. Specifically, they point out several points of contention amongst the parties, such as the date when Montes learned about the alleged malpractice, Montes' residence status,[2] the potential adverse effects of his health habits on his injury and recovery, and Montes' delay in seeking treatment despite alleged signs of complications at the injury site. They further argue that Dr. Tomljanovich's treatment of Montes' injury fell within the range of acceptable alternatives available for this type of injury, thus there is no causal relationship between the medical treatment afforded by SIF and Dr. Tomljanovich and the subsequent development of osteomyelitis in Montes' hand.

Considering the above, we will examine the uncontested facts, which pursuant to the parties' filings and Rule 56, are as follows.

*The parties*

Dr. Tomljanovich is a plastic surgeon authorized to practice medicine in Puerto Rico with a specialty in hand surgery. Plaintiffs' SUF ("SUF") ¶ 4; SIF's additional facts ("SIF's AF") at A.4 & J.1. He had a contract with IDM,[3] who in turn has a contractual relationship with

---

[2] Defendants allege that Montes is not a resident of Idaho, and instead lives in Puerto Rico, thus complete diversity is lacking in this case.

[3] IDM is a professional services corporation doing business in Puerto Rico. SUF at 2.

SIF to provide medical services related to, among others, the treatment of hand injuries and hand surgery. SUF at 2 & 3; SIF's AF at A.1, C.7 & D.1.

SIF is a public corporation created by the laws of the Commonwealth of Puerto Rico for the purpose, among others, of offering medical services, rehabilitation and economic compensation to workers that have suffered work-related accidents, injuries, diseases, or deaths. SUF at 3. SIF has contracts with other hospitals at Puerto Rico Medical Center ("PR Medical Center") that allow for SIF patients to be operated in those respective operating rooms. Id. at 2. IDM physicians may also have privileges to operate in hospitals outside PR Medical Center and the Industrial Hospital, and may legally refer a patient to those hospitals for surgery. Id. at 3.

The Industrial Hospital is owned and managed by the SIF. SIF's AF at K.1. It has operating rooms that are available to SIF physicians under contract to perform surgical procedures on SIF patients. Id. at K.2. The Industrial Hospital has an Operational Agreement for services with the Puerto Rico Administration of Medical Services ("ASEM") under which the SIF physicians under contract can utilize the PR Medical Center's operating rooms, which are available at all times, to perform surgical procedures on SIF patients as needed. Id. at F.3. The SIF also has contracts for services with several private hospitals under which said institutions provide operating rooms for the performance of surgical procedures on SIF patients as needed. Id. at F.4. The physician who will perform the surgery must request and make the necessary arrangements with the hospital to obtain the operating room. Id. at F.5. Dr. Tomljanovich has authority at Hospital Industrial to admit patients and be their attending physician, and he provided medical services to Montes. SUF at 2 & 7.

Simed is an insurance company in Puerto Rico authorized by the Insurance Commissioner. SUF at 1. Simed issued a Claims Made Policy on behalf of Dr. Tomljanovich, with a coverage of $100,000.00 for each medical incident. Id.

*Factual Background*

On July 12, 2004, Montes suffered a work related accident while working at a power generating plant of the Puerto Rico Electrical Power Authority ("PREPA") in Palo Seco. SUF at 5; SIF's AF at C.2.[4] Plaintiff received treatment at PREPA's Palo Seco medical dispensary before being transported by ambulance to the Industrial Hospital. SIF's AF at A.5 & B.8[5]; SUF at 5. At 11:55 a.m., he was transported by a Cataño Municipality Medical Emergency ambulance to the Immediate Care Unit of the Industrial Hospital, located in the PR Medical Center. SIF's AF at B.1. He was examined at the Screening Area of the Industrial Hospital's Immediate Care Unit at 12:02 pm. Id. at B.2. The Initial Triage examination done at 12:02 pm in the Screening Area indicates that the patient came in a wheeled stretcher, was alert and conscious. Id. at B.3. The chief complaint documented by triage personnel was "refers suffered trauma on the 3rd finger of his left hand when a machine caught a ring in his finger." Id. Patient habits also documented in the Triage included Smoking and Alcohol. Id. It is indicated in the "Interventions" documented in the Triage that the patient "c[ame] with [an] open IV from another hospital." Id. Montes was referred to X-rays, was administered an antitetanus injection

---

[4]  Montes was wearing a ring on the finger that was amputated due to the accident (SIF's AF at E.2) which according to Defendants, makes him liable for his own damages.

[5]  Dr. Luis Gutiérrez de Palma, Medical Lic. No. 10837, was the SIF staff physician who was on duty at the Industrial Hospital on July 12, 2004. SIF's AF at B.7. On that date, he took down Montes' patient history and physical examination at 5:15 pm. Id. Dr. Gutiérrez de Palma indicates that after the accident, Montes was evaluated in the PREPA Dispensary and referred to the Industrial Hospital. Id. at B.8.

("tetanus toxoid") and consultations were placed to surgery and Dr. Tomljanovich. Id.; Docket # 186, ¶ 6, p. 2-3.

Plaintiff was first evaluated by Dr. Guillermo Acosta Adrover ("Acosta"),[6] the physician on duty at the Industrial Hospital's Immediate Care Unit at 1:00 pm on July 12, 2004. SUF at 6; SIF's AF at B.4, I.2 & I.3. In the Physical History section, Dr. Acosta noted the following regarding his physical examination of Plaintiff: "Case of a 39 y/o male patient who works as an assistant with history of left third finger traumatic laceration while working today. Ext: Left 3rd finger Third proximal degloving with ring in the finger. Involving both arteries. Full ROM. No tendon tears. Avulsion." SIF's AF at B.4. He reported X-rays as negative. Id. The diagnostic impression is documented as: "Left 3rd finger third proximal avulsion with degloving." Id. at B.4 & I.4. Plaintiff was ordered local care anesthesia, and cleansing of the wound area with normal saline 0.9 and betadine. Id. at B.4 & I.5. At 2:35 p.m., pursuant to the doctor's orders, nurse Lucia Villegas washed Plaintiff's wound with an antibacterial and applied disinfectant. SUF at 6; SIF's AF at I.5. Dr. Acosta noted that the "[h]and surgeon [was] consulted and [the] patient [was] admitted." SIF's AF at B.4 & I.6.

Dr. Tomljanovich responded to the consultation placed by Dr. Acosta. SIF's AF at J.2. Dr. Acosta hospitalized Plaintiff by order of Dr. Tomljanovich. SUF at 7; SIF's AF at B.5 & I.6. The notes indicate that at 2:35 p.m. on July 12, 2004, Plaintiff was admitted to hand surgery service by order of Dr. Tomljanovich. SIF's AF at B.4, B.6, I.6 & I.8. At that time, Dr. Acosta ordered that Plaintiff be administered Maxipime 2 gms. an ample-spectrum antibiotic, intravenously; Percocet 5325 for pain; Nexium 40 mg to prevent gastritis and Ambien 10 mg. for inducing rest, and said orders were duly carried out. Id. at I.9.

---

[6] Dr. Acosta is a general practitioner; he has no medical specialty. SIF's AF at I.1.

Upon examining Plaintiff, Dr. Tomljanovich observed that there was a lot of damage, that gangrene would likely develop, and it would be a miracle if the finger could be saved. SUF at 8. Dr. Tomljanovich described Montes' injury as an avulsion of the soft tissues of his left middle finger at the level of the base of the finger, and noted that the bone was visible. SIF's AF at J.3. Plaintiff's left middle finger's blood vessels had been ripped and had suffered extensive damage. Id. at J.5. He diagnosed a "[l]eft middle finger with degloving," and noted that the finger had "[v]ery little chance of survival." Id. at B.5. He further noted that Plaintiff's finger would need amputation. Id. at B.5 & J.6; SUF at 9.  No specific tests were made to detect infection. SUF at 8. Dr. Tomljanovich stated he tried to make arrangements for Montes' surgery on July 12, 2004, but did not make any notes on the record regarding said attempt. SIF's AF at J.9. On that date, instead, he closed Plaintiff's wound with sutures after thorough cleansing and disinfection of the wound, to help prevent the development of infection while Montes awaited surgery. Id. at J.10. Although the finger would not be saved by suturing the skin, there was a chance that a little bit of skin could regenerate and survive, so as to allow the amputation to be performed at another level, more distant. Id.

From July 12 to 17, 2004, Plaintiff remained hospitalized in the Industrial Hospital. SIF's AF at B.9. While hospitalized, he was under the evaluation and care of IDM's hand surgeons; specifically, he was examined by Dr. Jan Pierre Segarra on July 14, by Dr. Amarylis Silva on July 15, and by Dr. Tomljanovich on July 17. Id. at B.10. During that time, Plaintiff was ordered treatment with intravenous antibiotics, local wound care and evaluation by the Hyperbaric Medicine Service. Id. at B.10 & B13. On July 14, 15 and 16, 2004, he was evaluated by the Hyperbaric Medicine Service and received treatment in the hyperbaric chamber. Id. at B.11. Upon examining Plaintiff on July 17, 2004, Dr. Tomljanovich read and examined Plaintiff's record as well as the notes made by the other attending hand surgeons. Id. at J.13. He noted that

the finger was not much better, and its amputation was inevitable. Id. at J.14. He further stated that the hyperbaric treatment administered to Montes between July 14 and July 16, 2004, by order of other attending hand surgeons, was ineffective. Id. at J.14; SUF at 9. His final diagnosis was "Ring avulsion left middle finger. Necrosis left middle finger." SIF's AF at J.14.

During his hospitalization, Plaintiff was also administered Maxipime 2 gm intravenous antibiotic to prevent infection,[7] Percoset, Nexium 40 mg, Aspirin 325mg and Ambien. SIF's AF at B.12 & J.18. According to the nurses' and doctor's notes, during his hospitalization, Plaintiff was smoking, and was oriented on several occasions about importance of ceasing said habit while under treatment. Id. at B.14.

By order of Dr. Tomljanovich, Plaintiff was discharged on July 17, 2004, in stable condition, alert and conscious, with normal lab results and ambulating independently, with no pain. SIF's AF at B.15 & J.17. He ordered a prescription of CIPRO 500 mg to continue preventative treatment against infection, Ultran 50 mg, his left 3rd finger was bandaged, and the patient was oriented as to care of the wound, activities at home, and ordered to attend a follow up appointment. Id. at B.15 & J.20.

Dr. Tomljanovich scheduled Plaintiff's ray amputation[8] surgery for July 24, 2004 at the Ashford Presbyterian Community Hospital ("Ashford Hospital"), because he had privileges to operate his patients there every third Saturday of the month. SIF's AF at J.17. Dr. Tomljanovich personally made the arrangements for the surgery with Ashford hospital. Id. He noted in the discharge order that Plaintiff's surgery was programmed at Ashford Hospital for July 24, 2004.

---

[7] Maxipime IV antibiotic was ordered in the Immediate Care Unit by Dr. Acosta, and since Dr. Tomljanovich agreed with said order he did not order any additional antibiotic treatment. SIF's AF at J.19.

[8] Dr. Tomljanovich described a ray amputation as an amputation of the finger that includes part of the metacarpal. SIF's AF at J.21.

Id. at B.16. The surgery, however, did not take place as scheduled.  SUF at 10; SIF's AF at C.2; Dockets # 185, p. 3, ¶ 10; Docket # 186, p. 5, ¶ 10.[9]  On July 24, 2004, based on his observations, Dr. Tomljanovich determined that Plaintiff's finger was not infected; it showed no signs of infection. SIF's AF at J.23.

On July 24, 2004, at 10:30 p.m, Plaintiff went to the Emergency Room at the PR Medical Center complaining of pain in his left hand. SIF's AF at B.17. He was evaluated by Dr. Olga Iris Cruz-Resto ("Dr. Cruz"), the  physician on duty at the ER, who administered Percoset and placed a consultation to Industrial Hospital. Id.[10] Plaintiff was later evaluated by the Industrial Hospital's in-house doctor on duty, Dr. Milagros Adorno-Rivera ("Dr. Adorno"), who consulted with Dr. Tomljanovich via telephone call. Id. By order of Dr. Tomljanovich, Plaintiff was discharged on July 25, 2004 at 8:15 a.m. and instructed to go to Ashford Hospital for surgery on July 26, 2004 at 7 a.m. Id.; SUF at 15.

On July 26, 2004, Dr. Tomljanovich examined Plaintiff and ordered his admission to the Industrial Hospital to perform the ray amputation surgery on August 2, 2004. SIF's AF at J.24. Plaintiff was admitted to the Industrial Hospital on July 28, 2004, since he told Dr. Tomljanovich that he could not be hospitalized on the 26th.  Id. at B.18 & J.24. He remained hospitalized until Dr. Tomljanovich perfomed surgery on his hand on August 2, 2004. SIF's AF at at B.18. On August 2, 2004, Plaintiff underwent a ray amputation of the 3rd middle finger of his left hand, performed by Dr. Tomljanovich. Id. at B.19 & J.25. Prior to surgery, Plaintiff signed a "Consent for Operation", in which he consented to a ray amputation of his left middle

[9]  There are conflicting statements as to why the surgery did not take place as scheduled, thus said issue cannot be adjudicated at summary judgment stage.

[10]  In their SUF ¶ 12, Plaintiffs aver that on July 25, 2004, at 12:35 am, Plaintiff went to the Bayamon Regional Hospital complaining of "stabbing pain."  The record citation, however, does not support said proposition.

finger and stated that he had been advised, among other risks, about the risk of infection as a result of the surgical procedure and was fully oriented as to the surgical process. Id. at B.20 & 21. He was discharged by Dr. Tomljanovich from the Industrial Hospital on August 2, 2004, and instructed to continue treatment at home with CIPRO 500 mg oral antibiotics. Id. at B.22, C.4 & J.26. He was given a follow-up appointment for August 9, 2004 at the Industrial Hospital's outpatient clinic with Dr. Tomljanovich. Id. at B.22 & J.26. The day after the surgery, Plaintiff went to San Pablo Hospital's ER complaining of intense pain in his left hand. SUF at 16. He left the hospital after he was examined by a physician but prior to being discharged by the same. Docket # 185, p. 5, ¶ 16.

On August 9, 2004, Dr. Tomljanovich examined Plaintiff and noted that the wound was healing well, "the skin is very solid, but has a little drainage on the dorsum. Should wash it." SIF's AF at B.23, C.5 & J.27. Dr. Tomljanovich further noted "we are going to send him to occupational therapy for a splint with the thumb out and a little mobilization. Return in 1 week." Id. at B.23. The medical record shows that Paintiff had a follow up appointment with Dr. Tomljanovich but he did not show up. Id. at C.6.

The splint ordered by Dr. Tomljanovich on August 9, 2004, was given to Plaintiff on August 10, 2004. SIF's AF at B.24. Plaintiff was examined again by another hand surgeon on August 30, 2004, who noted that his "hand [was] healing." Id. at B.25. Dr. Tomljanovich examined Plaintiff again in the Industrial Hospital's outpatient clinic on September 13, 2004, and noted that "the hand is moving pretty nice[ly] but he could benefit from having physical therapy. Needs a lot of support, has psychological problems. He will return in two months." Id. at B.26 & J.27.

Upon evaluation on September 14, 2004, Plaintiff's primary physician observed that Plaintiff was "sleepless" and "anxious," prescribed anxiolytics (Zoloft and Prosam) and referred

him to a psychologist. SIF's AF at B.27. On September 22, 2004, Plaintiff's primary doctor observed that his "wound closed," and he was discharged from the Wound Clinic. Id. at B.28. Plaintiff did not show up to his appointment with the primary doctor on October 6, 2004, nor with the psychologist on October 18, 2004. Id. at B.29.

By referral from SIF's primary doctor, on November 3, 2004, Plaintiff was evaluated by a psychiatrist. SIF's AF at B.30. In his psychiatric history, the doctor noted: "drug use ( +): marihuana since 18 years, 2-3 "feeling" until 2 hrs. ago when he had smoked 3 joints, cocaine since 27 years old, 2 or 3 $10 dollar-doses a day until yesterday when he inhaled 2 -$10 bags; crack (-); B2P (-); alcohol (-); cigarettes, 1 and a half packs a day." Id. He diagnosed Montes with "Drug Induced Mood Disorder" and "Dependency on Marihuana and Cocaine." Id. His emotional case was referred to the Psychiatric Board, which determined it was not work -related. Id. After receiving further follow up, Plaintiff's doctors at SIF determined that Plaintiff had received the maximum benefit he could from the treatment, and pursuant to SIF law, was discharged from the SIF on February 3, 2005 with a 15% disability resulting from his work-related accident. Id. at B.31. Said determination was notified on April 20, 2005. Id.[11]

On August 27, 2004, almost 6 months before being discharged from the SIF, Plaintiff applied for Social Security Disability Benefits, alleging as onset date of his disability the date of his labor accident, July 12, 2004. SIF's AF at B.33.[12] Upon return to his workplace, and

---

[11]  Said determination was notified on April 20, 2005. Id. at B.31. Plaintiff appealed the same to the Industrial Commission but later voluntarily withdrew his appeal. Id. at B.32.

[12]  On October 23, 2006, the Social Security Administration determined that Montes was disabled due to the following impairments: "status post amputation of left middle finger; oteomyelitis; left median, ulnar, and radial nerve mono-neuropathies; left supraspinal tendinoparhy with partial tear; left shoulder impigment syndrome; degenerative disc disease of the lumbrisacral spine; and an adjustment disorder with depress mood." SUF at 21. Plaintiff has never requested additional forms of aid for his condition other than retirement pay and Social Security disability benefits because nobody

pursuant to PREPA's physician's recommendation, Plaintiff was ordered to retire due to his complete and permanent disability. SUF at 18. His retirement was effective on July 20, 2006. Id.; SIF's AF at A.8.

Thereafter, Plaintiff moved to Boise, Idaho, where his parents reside because he needed financial assistance and to seek medical treatment for his condition. SUF at 19.  During his deposition, Plaintiff stated that in 2005, before moving to Idaho, his wound was still suppurating or producing some type of liquid substance. SIF's AF at E.1. As a result, on August 8, 2005, Plaintiff visited the ER at St. Luke's Regional Medical Center complaining of "a lot of pain" in his left hand. SUF at 20.  On August 12, 2005, Plaintiff was examined by surgeon Dr. Louis E. Murdock of Intermountain Orthopedic, who diagnosed chronic osteomyelitis. Id. On August 22, 2005, Dr. Murdock performed surgery on Plaintiff's left hand. Id. Murdock's preoperative and postoperative diagnosis was "oesteomyelitis third metacarpal of the left hand." Id.

On March 3, 2006, Plaintiff sued Defendants for medical malpractice in the Court of First Instance, San Juan Part (No. KDP-06-0295), based on the same facts alleged in the present suit, which was subsequently filed on August 10, 2007. Docket # 1.[13] Notwithstanding, during his deposition, Plaintiff stated that he had no idea his lawyers had filed said lawsuit on his behalf. SIF's AF at E.5.

*Treating Physicians' deposition testimony*

*1. Dr. Paul Tomljanovich*

---

explained that he may qualify for additional benefits, nor has he investigated the issue regarding the possibility of obtaining other benefits to complement his actual income. SIF's AF at E.6 & E.7. Plaintiff currently receives $2,296 a monthly benefits from retirement and Social Security disability. SIF's AF at A.8 &A.E.

[13]  During his deposition, Plaintiff testified that he first contacted a lawyer regarding his cause of action after Dr. Murdock performed his surgery, but could not recall the exact date. SIF's AF at E.4.

Dr. Tomljanovich stated that Montes' injury was not an emergency but an urgency, since his finger could not be saved and his life was not in danger. SIF's AF at J.11 He further explained that the finger could not survive if all the veins and arteries were damaged because blood circulation is not through the bone and the finger had less than 1% chance of survival. SUF at 8; SIF's AF at J.4 & J.5. Moreover, suturing the finger would not restore circulation. SUF at 9. He explained that even if a tissue dies due to lack of circulation, it will not always rot; if no bacteria are present, dead tissue might develop dry gangrene. SIF's AF at J.8. As to the presence of an infection, Dr. Tomljanovich stated that the fact that Plaintiff's finger turned black and blue was not necessarily an indication of rotten tissue or development of an infection. Id. at J.12. He did not find infection on Plaintiff's finger at any point during his treatment. Id. at J.23. According to Dr. Tomljanovich, the amputation could be done immediately or after days or weeks, and that delay would not make any difference in the outcome of the procedure. Id. at J.7.

Upon questioning by counsel, Dr. Tomljanovich admitted that he was aware that he could use ASEM's operating rooms to perform surgery on Plaintiff if the operating rooms at Industrial Hospital were not available (SIF's AF at J.15), and that as a doctor under contract for services with the SIF, he could also perform surgery in private hospitals, which had contracts for operating room facilities with the Industrial Hospital (Id. at J.16).

*2. Dr. Luis Guillermo Acosta Adrover*

During his deposition testimony, Dr. Acosta stated that he observed that Plaintiff's tendons were not fractured although the arteries could have been affected. SUF at 6; Docket # 186, ¶ 6, p. 3. Although he observed that the arteries might be compromised, he believed that they were whole because there was not abundant bleeding. SIF's AF at I.11. He further expressed that he did not suture the wound at the time because "that was an infected wound,"

that had to be cleaned and disinfected until a surgeon examined the wound. SUF at 6; Docket # 186, ¶ 6, p. 3. On this issue, Dr. Acosta explained that suturing an infected wound could lead to worse infections, such as bone infection, osteomyelitis and the patient could end up losing his hand or extremity. SUF at 6. Although Dr. Acosta stated that in his experience certain injuries should not be sutured due to risk of infection, he admitted that he is not a specialist and therefore, cannot state whether an injury like Plaintiff's should not be sutured. SIF's AF at I.10. He clarified that certain types of injuries should not be sutured until seen by the surgeon. Id. He further stated that the hand surgeon is the one who will decide if he will suture the patient. Id.

Lastly, Dr. Acosta stated that according to the Immediate Care Unit's protocol regarding management of trauma, when a patient with an injury like Montes' is admitted, the wound is cleaned, the patient is immunized and passed on to medical evaluation. SIF's AF at I.7. If the physician determines the injury is severe and may require hospitalization, as in Montes' case, the physician does not intervene further and waits for the hand surgeon to evaluate the patient, and the specialist is the one who decides the course of treatment to be administered to the patient. Id.

*3. Dr. Olga Iris Cruz-Resto*

Dr. Cruz, the ER Physician at ASEM who examined Plaintiff on July 24, 2004, testified that pursuant to the medical record, Plaintiff's finger had infected skin which had developed gangrene, that at the time he described suffering "maximum pain intensity," and that the finger expelled a bad odor. SUF at 12.  Dr. Cruz also described that Plaintiff's finger had a blister, which meant that it was infected and that bacteria generated a gas that caused the blister and pain, and thus the proximal phalanx was infected and necrotic. Id. at 13.[14] She further explained

_____

[14]   Page 25 is missing from Plaintiff's Exhibit 7, thus the second sentence is not supported by the record. Similarly, there is no record citation in support of the last sentence.

that prompt action was needed because the infection could attack the bones and Plaintiff could develop oteomyelitis. Id. at 14.[15]

### 4. Dr. Jan Pierre Zegarra

Dr. Zegarra, who treated Plaintiff at Industrial Hospital on July 14, 2004, stated that it was not mandatory for a doctor to perform tests to detect infection if the treating physician had already diagnosed that the patient had no infection. SIF's AF at H.1. According to Dr. Zegarra, an infection takes more than one day to develop, and there was no indication of infection on Plaintiff's wound. Id. at F.2 & 3. Dr. Zegarra also stated that a doctor that observes that hyperbaric treatment is not having any effect may cancel the treatment. Id. at F.4. He further notes that if he had known that the wound went all the way down to the bone, he would not have ordered hyperbaric treatment. Id. at F.7; SUF at 24. Dr. Zegarra also informed that he did not see annotations as to the suturing of the finger by Dr. Tomljanovich. SUF at 24. Upon questioning by Plaintiff's counsel, he stated that this type of injury has a high incidence of infection, and that when gangrene is present, a physician must be certain that there is no infection. Id.[16] Lastly, he stated that smoking always adds to morbidity. SIF's AF at F.5.

### Defendants' expert Dr. Sandy Gonzalez

Dr. Gonzalez stated that it was not unreasonable to postpone Plaintiff's surgery on July 17, 2004. SIF's AF at G.1. He further testified that a digital amputation was not possible on Plaintiff's finger, and that a ray amputation was the best choice for the third finger of the hand. Id. at F.2.

### Plaintiff's Expert Dr. Raymond M. Dunn

---

[15]   Page 27 is missing from Plaintiff's Exhibit 7, thus the second sentence is not supported by the record.

[16] Pages 194 and 195 are missing from Exhibit 19.

In his expert report, Dr. Dunn concluded that Plaintiff (a) had evidence of tissue compromise at the time of arrival at the ER of Industrial Hospital, (b) that he suffered subsequent delays in definitive management, (c) those delays predisposed Plaintiff to suffering a subsequent infection when definitive amputation surgery was finally performed, (d) there is no evidence that Plaintiff was treated with adequate antibiotics or further therapy in the immediate period after the original finger amputation, and (e) it is more likely than not that this absence of treatment compounded the delays creating more likelihood of infection, and had the original surgery not been delayed a ray amputation might have not been necessary. SUF at 22. He supplemented his report on April 14, 2010. Id. at 23.

During his deposition, Dr. Dunn admitted that he did not consult any other doctors regarding Plaintiff's case. SIF's AF at F.1. He also admitted that a tertiary hospital is a referral institution, and that he does not know what relationship SIF has with other hospitals at PR Medical Center. Id. at F.2. & F.3. According to Dr. Dunn, an isolated event does not establish a deviation from the standard of care. SIF's AF at F.6.

In Dr. Dunn's opinion, at the time of initial care of the wound, it was reasonable to give Plaintiff antibiotics, and he believes that an intravenous dose of antibiotics was administered at the SIF's urgency room, and that Plaintiff may have received oral antibiotics after his discharge from the hospital. SIF's AF at F.4. Notwithstanding, he admitted that he did not know which antibiotics were given to Plaintiff. Id. at F.15. He does, however, state that the amputation itself was the necessary consequence of the injury. Id. at F.18. When asked if failing to take prescribed antibiotics affects recovery, and specifically a possible infection, Dr. Dunn stated that it would depend on many factors. Id. at F.9. He further noted that smoking never helps in recovery and he would not recommend taking alcohol with antibiotics even though

there is no evidence to suggest that narcotics have any negative influence on healing or infections. Id. at F.7. & F.8.

       As to the amputation, Dr. Dunn further stated that there is no absolute time window under which Plaintiff's finger should have been amputated, only that one or two days would probably be acceptable, and immediately would be the best alternative. SIF's AF at F.23. He did not find, in the record, any complications during the surgery performed by Dr. Tomljanovich. Id. at F.25. Moreover, he stated that Dr. Tomljanovich's decision to perform a ray amputation was a clinical medical judgment and a probable choice. Id. at F.26. As a matter of fact, he concluded that the nature of Montes's injury required an amputation. Id. at A.10. In his opinion, the reconstruction of the blood vessels in the finger that had zero percent chance of survival "could" have been done but "should"not have been done. Id. at F.19.

       Dr. Dunn explained that an infection and osteomyelitis are two different things. SIF's AF at F.12. According to Dr. Dunn, there are many ways that an infection can develop and cannot pinpoint how it happened in this case. Id. at F.14. He admits that a drainage in a wound is not on itself indicative of an infection. Id. at F.5. He further stated that although there is no description of necrosis or gangrenous tissue at the ray amputation level, there was necrotic tissue in the area of the amputation. Id. at F.18. In Dr. Dunn's opinion, from the time of Plaintiff's last visit to SIF Industrial Hospital or outpatient clinics to the time he received treatment in Idaho, the osteomyelitis was continuously developing. Id. at F.22. He further explained that osteomyielitis may not be clinically apparent for up to years after inception, and in Montes's case, the osteomyelitis became apparent and was first diagnosed when Dr. Murdoch examined the patient in Idaho. Id. at A.10, F.11 & F.13.

       Dr. Dunn's conclusions did not take into consideration facts emerging from the SIF record that were in Spanish because he is not completely familiar with the language. SIF's AF

at A.10. Moreover, as to SIF's deviation from the standard of care, Dr. Dunn stated that although he was not familiarized with the Industrial Hospital's administrative procedures or healthcare delivery system and he is not an expert in hospital administration, if there is no provision for a doctor to access an operating room, either in-house or by transfer, that would be SIF's only deviation from the standard of care. Id. at A.10 & F.24.

*Analysis*

After reviewing the above-stated uncontested facts in the light most favorable to the non-movant, this Court finds that Plaintiffs' request for entry of summary judgment is unwarranted at this time.

First, we note that there are material issues of fact as to Montes' habits' effects on his recovery and subsequent complications from his injury. Specifically, the SIF's records show that, after his evaluation on November 3, 2004, the psychiatrist noted: "drug use ( +): marihuana since 18 years, 2-3 "feeling" until 2 hrs. ago when he had smoked 3 joints, cocaine since 27 years old, 2 or 3 $10 dollar-doses a day until yesterday when he inhaled 2 -$10 bags; crack (-); B2P (-); alcohol (-); cigarettes, 1 and a half packs a day." SIF's AF at B.30. At that time, he diagnosed Montes with "Drug Induced Mood Disorder" and "Dependency on Marihuana and Cocaine." Id. On the other hand, during his deposition, Montes stated that he may have begun smoking after he was 20 years old, although he doesn't remember an exact age. Id. at  E.9. He further testified that he was not a drug user but had tried marijuana in high school. Id. at E.10. These conflicting allegations preclude summary judgment as to this issue, which may be of particular relevance in determining whether Montes' actions contributed in any way to the development of osteomyelitis in his hand.  Additionally, Plaintiff did not seek treatment for over 8 months prior to visiting St. Luke's in Idaho (see Id. at A.9 & F.10), despite stating that in 2005, before he moved to Ohio, his wound was still suppurating (Id. at E.11). Thus there are

diverging versions of facts as to this issue that are crucial to determining whether Montes is partially responsible for his damages.

Controversy also remains as to why Montes' surgery did not take place on July 24, 2004, as initially scheduled. During his deposition, Dr. Tomljanovich stated that Plaintiff's surgery programmed for July 24, 2004, was cancelled because the anesthesiologist refused to open the operating room for only one patient. SIF's AF at J.22; see also C.3. However, he did not make an incident report regarding this situation. Id. Plaintiffs, on the other hand, avers that pursuant to Dr. Manuel Medina Hernandez's[17] testimony, the services were not provided by Ashford hospital because they were owed money. SUF at 10; see also Docket # 185, p. 3, ¶ 10, Docket # 186, p. 5, ¶ 10.  It is unclear who allegedly owed the money to Ashford hospital. Therefore, there is a controversy as to why the July 24, 2004 surgery was cancelled, which according to Plaintiffs, may have adversely impacted Montes' recovery.

Most importantly, there is diverging testimony from the treating physicians as to whether Montes' finger was ever infected, and this eventually led to the development of osteomyelitis. During his deposition, Dr. Acosta expressed that he did not suture the wound at the time because "that was an infected wound" that had to be cleaned and disinfected until a surgeon examined the wound. SUF at 6; Docket # 186, ¶ 6, p. 3. Dr. Cruz, the ER Physician at ASEM who examined Plaintiff on July 24, 2004, also testified that pursuant to the medical record, Plaintiff's finger had infected skin which had developed gangrene, that he described suffering "maximum pain intensity," and that the finger expelled a bad odor. SUF at 12. Cruz further described that Plaintiff's finger had a blister, which meant that it was infected and that bacteria

[17] Instituto de Manos' president.

generated a gas that caused the blister and pain, and thus the proximal phalanx was infected and necrotic. Id. at 13.[18]

Dr. Tomljanovich, however, states that although no specific tests were made to detect infection, Montes' finger never showed signs of infection. SIF's AF at J.23; SUF at 8. According to him, the fact that Plaintiff's finger turned black and blue was not necessarily an indication of rotten tissue or development of an infection. SIF's AF at J.12.  Dr. Zegarra, who also treated Plaintiff at Industrial Hospital, stated that it was not mandatory for a doctor to perform tests to detect infection if the treating physician had already diagnosed that the patient had no infection. SIF's AF at H.1. Moreover, according to Dr. Zegarra, an infection takes more than one day to develop, and there was no indication of infection on Plaintiff's wound. Id. at F.2 & 3. Therefore, there is conflicting deposition testimony as to this issue, which is better left for a jury to decide.

Lastly, we note that as of October 19, 2006 and later February 15, 2007, Plaintiff informed the SIF Administrator through his attorney that his address was: Jardines de Lafayette, R-1, Calle 5, Arroyo, PR 00714. SIF's AF at B.34 & B.35. This raises serious doubts about Montes' allegations regarding diversity jurisdiction which have been repeatedly contended by Defendants. Moreover, there is still controversy regarding when he learned about the injury upon which the present suit is based. According to Plaintiff, he was diagnosed with osteomyelitis after being examined by Dr. Murdock on August 12, 2005. SUF at 20. In his deposition, however, Plaintiff stated that he knew he was suffering from malpractice and could sue at the moment he went to San Pablo Hospital in Bayamón for treatment in January 2005. SIF's AF at E.1. The record shows that it was not until March 3, 2006 that Plaintiff sued

---

[18]   Page 25 is missing from Plaintiff's Exhibit 7, thus the second sentence is not supported by the record. Similarly, there is no record citation in support of the last sentence.

Defendants for medical malpractice in the Court of First Instance, San Juan Part (No. KDP-06-0295), and the present suit was filed on August 10, 2007. Thus whether Plaintiff learned about his alleged damages on January or August 2005 is crucial to determining if he filed suit within the one year period for tort actions under Article 1802 or if his claims are time-barred.

**Conclusion**

For the reasons stated above, Plaintiff's motion for partial summary judgment is **DENIED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 21st day of March, 2011.

*S/SALVADOR E. CASELLAS*
Salvador E. Casellas
U.S. Senior District Judge